FRANCIS M. GREGOREK (144785)
gregorek@whafh.com
BETSY C. MANIFOLD (182450)
manifold@whafh.com
RACHELE R. RICKERT (190634)
rickert@whafh.com
WOLF HALDENSTEIN ADLER
  FREEMAN & HERZ LLP
Symphony Towers
750 B Street, Suite 2770
San Diego, CA 92101
Telephone: 619/239-4599
Facsimile: 619/234-4599

LAW OFFICE OF JACOB T. FOGEL, PC
JACOB T. FOGEL (2827178)
32 Court Street, Suite # 602
Brooklyn, New York 11201
Telephone: 718/221-5552
Facsimile: 718/228-0278

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| CONGREGATION BETH AARON, Derivatively on Behalf of Yahoo! Inc., | CASE NO. 5:08-CV-05438-RMW |
| Plaintiff, | DERIVATIVE ACTION |
| v. | AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT |
| JERRY YANG, RON BURKLE, ROBERT KOTICK, GARY WILSON, MAGGIE WILDEROTTER, ROY BOSTOCK, ERIC HIPPEAU, ARTHUR R. KERN, EDWARD KOZEL, and VYOMESH JOSHI | |
| Defendants, | JURY TRIAL DEMANDED |
| YAHOO! INC. | |
| Nominal Defendant. | |

AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Congregation Beth Aaron, by its attorneys, derivatively on behalf of Yahoo! Inc. ("Yahoo" or the "Company") alleges upon personal knowledge as to itself and its own acts, and upon information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through undersigned counsel, which included, among other things, a review of Securities and Exchange Commission ("SEC") filings, news reports, press releases and other publicly available documents, regarding Yahoo as follows:

## NATURE OF THE ACTION

1.      This is a shareholder's derivative action brought for the benefit of nominal Defendant Yahoo against certain members of its Board of Directors (the "Yahoo Board" or "Board") and certain of its executive officers seeking to remedy Defendants' breaches of fiduciary duties, statutory violations, and other violations of law.

2.      This action seeks redress for the harm done to Yahoo, and indirectly to its stockholders, resulting from the improper entrenchment of the Company's top executives and directors, who violated state and federal law, breached their fiduciary duties of loyalty and good faith to the Company by entrenching themselves into positions of power at the expense of Yahoo through a December 18, 2008 settlement of a derivative action.  Under the December 18, 2008 settlement, the Yahoo Board avoids all liability for its various breaches of fiduciary duties in 2008, including rejecting a valuable opportunity to sell the Company, using a defensive and self-interested severance plan to entrench themselves, engaging in an expensive yet doomed negotiation with Google, Inc. which faced antitrust issues from the outset, and disseminating materially misleading proxy materials to induce shareholder approval of their misconduct.  So, although the Yahoo Board's conduct caused the Company to lose nearly *$22 billion* in market capitalization over a nine month period and to spend over *$110 million* relating to their misconduct, under the terms of December 18, 2008 settlement, Yahoo will receive no cash or non-cash value, Plaintiffs' attorneys will be paid $12 million in fees and the Yahoo Board will retain their current positions by making minor changes in a severance plan.  Thus, by settling without any admission of liability or reimbursement for the Company's losses, the Yahoo Board has only further entrenched themselves at the shareholder's and Company's expense.  The Yahoo Board

- 1 -

1  also disseminated materially misleading proxy materials responding to a stockholder proposal on

2  the Company's compensation practices.

3  <u>**LIABILITY AVOIDED BY THE DECEMBER 18, 2008 SETTLEMENT**</u>

4  　　　3.　　On February 1, 2008, before the market opened, Microsoft publicly announced that

5  it had made a proposal to the Yahoo Board to acquire all the outstanding shares of Yahoo common

6  stock for $31 per share representing a total equity value of approximately $44.6 billion and a 62%

7  premium to the previous day's closing price.  Pursuant to the offer terms, the proposal would

8  allow Yahoo shareholders to elect to receive cash or a fixed number of shares of Microsoft

9  common stock, with the total consideration payable to Yahoo shareholders consisting of one-half

10 cash and one-half Microsoft common stock.

11 　　　4.　　Although the Yahoo Board issued a press release in response to Microsoft's

12 February 1, 2008 offer stating that the Board "will evaluate this proposal carefully…," the Yahoo

13 Board, instead, engaged in a pattern of inequitable conduct, abdicated its fiduciary role and instead

14 made decisions to protect their positions at the expense of Yahoo.  For example, instead of

15 negotiating in good-faith and evaluating the proposal, the Yahoo Board immediately implemented

16 change-in-control plans that would render an acquisition of Yahoo far less attractive, if not

17 unfeasible, for Microsoft, and in the process compromised the Company's key business.  An

18 acquisition of Yahoo or shareholder election of an insurgent Board would trigger the enacted

19 change-in-control provisions.

20 　　　5.　　Thus, within days of the February 1, 2008 Microsoft offer, the Yahoo Board

21 approved and adopted change-in-control employee severance plans that imposed tremendous

22 costs, burdens, and uncertainties for both an acquirer and any shareholder-sponsored challenge to

23 the Yahoo Board.  Such conduct essentially limited any potential increase in the offer price by

24 Microsoft, and limited any hopes of friendly negotiations and a smooth transaction.

25 　　　6.　　The change-in-control employee severance plans, approved by the Yahoo Board on

26 February 10, 2008, were highly controversial and unusual.  First, the severance plans reward *every*

27 Yahoo employee with *full* equity acceleration and rich cash benefits.  The approximate cost to any

28 acquirer, such as Microsoft, would be $2.1 billion at $31 per share and would limit Microsoft's

AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1  ability to further increase its offer. Second, a Yahoo employee receives a full acceleration of all

2  options along with substantial cash benefits if a change-in-control occurs and any Yahoo

3  employee is terminated or resigns due to "substantial adverse alteration" of their duties. Thus, any

4  potential acquirer or new Yahoo Board risks a mass employee exodus if any changes,

5  reassignments and restrictings are done. Under the plans, Yahoo employees therefore are

6  incentivized to resign and receive benefits upon a change of control because they need not be

7  terminated. A Yahoo employee may resign and receive full benefits if there is a "substantial

8  adverse alteration" in their duties. So, for example, *for two years* following a successful proxy

9  battle, any effort by a new board to restructure, reorganize or reduce the work force would allow

10 any affected employee the right to resign and claim full benefits. Third, the plan further deters any

11 acquisition and challenge to the Yahoo Board because the Yahoo Board cannot terminate the plans

12 if any offer is pending or any proxy contest is on-going. Thus, the plans effectively prevent any

13 efforts by an acquirer or even a shareholder-sponsored proxy challenge to the Yahoo Board

14 because, if successful, any firing, movement or deployment of employees exposes the Company to

15 large severance payments.

16        7.     The Yahoo Board's own compensation consultant, Compensia, advised Yahoo ***not***

17 to grant all employees the right to claim severance on a change of the duties or responsibilities and

18 further advised that the severance benefits under the plans were very aggressive. The Yahoo

19 Board authorized these plans even knowing that Microsoft was willing to spend $1.5 billion to

20 encourage key employees to remain with the Company. The severance plans effectively

21 entrenched the Board against any change-in-control. Thus, the plans were never designed to

22 protect and retain Yahoo employees but instead used the Yahoo employees as a defensive weapon

23 to further protect the Board.

24        8.     Throughout the discussions with Microsoft, the Yahoo Board was looking for a

25 deal with anyone other than Microsoft and even proposed a partnership with Google even though a

26 prior venture had been rejected as inconsistent with Yahoo's long term strategy. After a two week

27 trial of outsourcing Yahoo's valuable search functions to Google in April 2008, the Yahoo Board

28 approved a commercial relationship in June 2008 with Google. The partnership agreement

- 3 -

included a $250 million termination fee if Yahoo entered into a transaction with Microsoft. However, the proposed partnership, not surprisingly, was immediately challenged by the government on antitrust grounds and, in November 2008, Google walked away from the partnership rather than challenge the government's actions.

9.     At a May 3, 2008 face to face meeting, Microsoft raised its offer to $33 per share. At the insistence of management no Yahoo financial advisor or outside director attended the meeting.  In response to the Microsoft offer, Defendant Jerry Yang made it clear that Yahoo would abandon its core strategy by outsourcing its valuable search functions to Google if Microsoft took its offer directly to Yahoo shareholders.  As a result, Microsoft quickly withdrew its offer in a letter stating "after giving this week's conversations further thought, it is clear to me that it is not sensible for Microsoft to take our offer directly to your shareholders…. Our discussions with you have led us to conclude that, in the interim, you would take steps that would make Yahoo undesirable as an acquisition for Microsoft."

10.     As part of their improper conduct, the Yahoo Board issued false and misleading statements in their Definitive Proxy filed with the SEC on June 9, 2008 about the severance plan provisions adopted by the Board, which was the basis of the proposed vote on the re-election of the Yahoo Board and a related shareholder proposal limiting compensation to the Company's performance only.  The proposed severance plans were intended not to protect Yahoo's on-going business strategy, were not related to performance, and did not seek to retain key Company employees, but instead imposed substantial costs and uncertainty on any potential acquirer or any proxy contestant who challenged the Yahoo Board.

11.     The Yahoo Board's defensive and self-interested conduct was grossly improper in response to Microsoft's proposal for a friendly merger.  There was no question about Microsoft's ability to finance the transaction, yet the Yahoo Board's actions precluded any good faith consideration of the Microsoft offers.  After withdrawing its merger proposal, Microsoft did indicate a willingness to negotiate an alternative transaction but only if the Yahoo Board was replaced.  As a Microsoft source was quoted in a July 13, 2008 article, "It's just impossible to deal

AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

with the Yahoo Board or Yang… They have no intention of negotiating, so we're just going to do what we have to do."

12.     Throughout the Microsoft offers, while the Yahoo Board refused to engage in good faith negotiations, entrenched themselves at the expense of Yahoo, and misled shareholders in proxy statements, the price of Yahoo shares declined significantly from $28.38 on February 1, 2008 to $12.20 on November 7, 2008, a loss of 43% or $22 billion in Market Capital. Furthermore, the Company spent over $110 million in rejecting Microsoft's overtures.

13.     On December 18, 2008, the Yahoo Board entered into a settlement for $0 cash to the Company and $0 non cash benefit to the Company in exchange for a very broad and complete release of all claims relating to the Microsoft offer, the severance plan or proxy battle arising out of the 2008 proxy battle.   The only consideration for the release of these claims is minor modifications of the severance plan.  The December 18, 2008 settlement effectively entrenches the Board against any further challenges relating to their widespread improper conduct in 2008.

## JURISDICTION AND VENUE

14.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §1331 in that this Consolidated Complaint states a federal question.  This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(2) in that Plaintiffs and Defendants are citizens of different states and the matter in controversy exceeds $75,000.00, exclusive of interests and costs.  This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. §1367(a). This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

15.     Venue is proper in this District pursuant to 28 U.S.C. §1391(a)(2) because Defendant Yahoo is headquartered in this District and a substantial portion of the transactions and occurrences complained of herein, including the Defendant's primary participation in the wrongful acts detailed herein, occurred in this District.  In addition, one or more of the Defendants either resides in or maintains executive offices in this District.

## PARTIES

16.     Plaintiff Congregation Beth Aaron, resident of the state of New York, owns 300

- 5 -

shares of Defendant Yahoo common stock and has owned such shares at all relevant times described herein.

17.     Nominal Defendant Yahoo is a corporation organized and existing under the laws of the State of Delaware.  Yahoo maintains its principal offices at 701 First Avenue, Sunnyvale, California, 94089.   Yahoo is the second largest provider of internet services to users and businesses worldwide.

18.     Defendant Jerry Yang ("Yang") co-founded the Company in 1995.   Yang co-developed Yahoo in 1994 while he was working towards his Ph.D. in Clerical Engineering at Stanford University.   He was Chief Executive Officer ("CEO") from June 2007 until his resignation on January 18, 2009, a member of the Board of Yahoo since March 1995 and is a resident of Sunnyvale, California.

19.     Defendant Ron Burkle ("Burkle") has been a member of the Board of Yahoo since November 2001 and is a resident of California.  In 2008, Burkle was a member of the Board's Compensation and Transaction Committee.  According to Yahoo's proxy statement filed with the SEC on April 30, 2007 and on June 9, 2008, in fiscal year 2006, Burkle received compensation of $588,424 and in fiscal year 2007 received compensation of $499,264.

20.     Defendant Robert Kotick ("Kotick") was a member of the Board of Yahoo from March 2003 to August 1, 2008 and is a resident of California.  On August 1, 2008, upon Kotick's resignation, Carl C. Cohn was appointed to fill the vacancy on the Board.  According to Yahoo's proxy statement filed with the SEC on April 30, 2007 and on June 9, 2008, in fiscal year 2006, Kotick received compensation of $621,411 and in fiscal year 2007 received compensation of $492,774.

21.     Defendant Gary Wilson ("Wilson") has been a member of the Board of Yahoo since November 2001 and is a resident of California.  According to Yahoo's proxy statement filed with the SEC on April 30, 2007 and on June 9, 2008, in fiscal year 2006, Wilson received compensation of $588,424 and in fiscal year 2007 received compensation of $482,046.

22.     Defendant Maggie Wilderotter ("Wilderotter") has been a member of the Board of Yahoo since July 2007 and is a resident of Connecticut.  As a new director in 2007, according to

- 6 -

Yahoo's proxy statement filed with the SEC on April 30, 2007, Wilderotter should have received under the Company's 1996 Directors' Stock Plan, a nonqualified stock option to purchase 30,000 shares of common stock and an award of 10,000 restricted stock units on the date she first became a director.  According to Yahoo's proxy statement filed with the SEC on June 9, 2008, Wilderotter received compensation of $205,832 in fiscal 2007.

23.     Defendant Arthur Kern ("Kern") has been a member of the Board of Yahoo since January 1996 and is a resident of California.  In 2008, Kern was a member of the Board's Compensation Committee.  According to Yahoo's proxy statement filed with the SEC on April 30, 2007 and on June 9, 2008, in fiscal year 2006, Kern received compensation of $606,298 and in fiscal year 2007 received compensation of $496,990.

24.     Defendant Eric Hippeau ("Hippeau") has been a member of the Board of Yahoo since January 1996 and is a citizen of France and is a resident of Massachusetts.  In 2008, Hippeau was a member of the Board's Transaction Committee.  According to Yahoo's proxy statement filed with the SEC on April 30, 2007 and on June 9, 2008, in fiscal year 2006, Hippeau received compensation of $606,298 and in fiscal year 2007 received compensation of $496,674.

25.     Defendant Roy Bostock ("Bostock") has been Chairman of the Board since January 2008 and a member of the Board of Yahoo since May 2003 and is a resident of Florida.  In 2008, Bostock was a member of the Board's Compensation Committee.  According to Yahoo's proxy statement filed with the SEC on April 30, 2007 and on June 9, 2008, in fiscal year 2006, Bostock received compensation of $649,788 and in fiscal year 2007 received compensation of $499,264.

26.     Defendant Edward Kozel ("Kozel") has been a member of the Board of Yahoo since 2000 and is a resident of California.  According to Yahoo's proxy statement filed with the SEC on April 30, 2007 and on June 9, 2008, in fiscal year 2006, Kozel received compensation of $618,195 and in fiscal year 2007 received compensation of $516,202.

27.     Defendant Vyomesh Joshi ("Joshi") has been a member of the Board of Yahoo since July 2005 and is a resident of California.  In 2008, Joshi was a member of the Board's Transaction Committee.  According to Yahoo's proxy statement filed with the SEC on April 30,

AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1   2007 and on June 9, 2008, in fiscal year 2006, Joshi received compensation of $600,098 and in

2   fiscal year 2007 received compensation of $579,520.

3        28.     The Defendants named above in ¶¶18-27 are collectively referred to herein as the

4   "Director Defendants."

5   ## DUTIES OF INDIVIDUAL DEFENDANTS

6        29.     The Director Defendants, by reason of their corporate directorship and/or executive

7   positions, stand in a fiduciary position relative to the Company's shareholders, which fiduciary

8   relationship, at all times relevant herein, required the Individual Defendants to exercise their best

9   judgment, and to act in a prudent manner and in the best interest of the Company and its

10  shareholders.

11       30.     The Director Defendants owe fiduciary duties including good faith, loyalty, fair

12  dealing, due care, and candor to Yahoo and its shareholders.

13       31.     Each Director Defendant herein is sued individually, as a conspirator and aider and

14  abettor, as well as in their capacity as officers and/or directors of the Company, and the liability of

15  each arises from the fact that he or she has engaged in all or part of the unlawful acts, plans,

16  schemes, or transactions complained of herein.

17  ## BACKGROUND

18       32.     On a January 31, 2008, Microsoft CEO, Steve Ballmer ("Ballmer"), told Defendant

19  Yang that Microsoft much preferred to negotiate a deal in private but was prepared to disclose its

20  offer publicly because of concerns that Defendant Yang would never support any deal, regardless

21  of price.  According to the notes disclosed in another litigation, Ballmer stated that Microsoft

22  "care[s] about employees," "want[s] employees to be OK," and was contemplating paying "$1.5b

23  for retention of employees," in addition to the "$45b for deal."  The January 31 proposal made

24  clear that Microsoft sought a friendly deal to acquire all shares on equal terms.  The offer was not

25  contingent on outside financing, and in light of Microsoft's financial strength, there could be no

26  serious concern about its ability to close.

27       33.     On February 1, 2008, Microsoft released a letter its CEO, Ballmer, sent to the

28  Yahoo Board on January 31, 2008 ("January 31st Offer"):

- 8 -

Dear Members of the Board:

I am writing on behalf of the Board of Directors of Microsoft to make a proposal for a business combination of Microsoft and Yahoo.  Under our proposal, Microsoft would acquire all of the outstanding shares of Yahoo common stock for per share consideration of $31 based on Microsoft's closing share price on January 31, 2008, payable in the form of $31 in cash or 0.9509 of a share of Microsoft common stock.  Microsoft would provide each Yahoo shareholder with the ability to choose whether to receive the consideration in cash or Microsoft common stock, subject to pro-ration so that in the aggregate one-half of the Yahoo common shares will be exchanged for shares of Microsoft common stock and one-half of the Yahoo common shares will be converted into the right to receive cash.  Our proposal is not subject to any financing condition.

Our proposal represents a 62% premium above the closing price of Yahoo common stock of $19.18 on January 31, 2008.  The implied premium for the operating assets of the company clearly is considerably greater when adjusted for the minority, non-controlled assets and cash.  By whatever financial measure you use - EBITDA, free cash flow, operating cash flow, net income, or analyst target prices - this proposal represents a compelling value realization event for your shareholders.

We believe that Microsoft common stock represents a very attractive investment opportunity for Yahoo's shareholders.  Microsoft has generated revenue growth of 15%, earnings growth of 26%, and a return on equity of 35% on average for the last three years.  Microsoft's share price has generated shareholder returns of 8% during the last one year period and 28% during the last three year period, significantly outperforming the S&P 500.  It is our view that Microsoft has significant potential upside given the continued solid growth in our core businesses, the recent launch of Windows Vista, and other strategic initiatives.

\* \* \*

Our proposal is subject to the negotiation of a definitive merger agreement and our having the opportunity to conduct certain limited and confirmatory due diligence. In addition, because a portion of the aggregate merger consideration would consist of Microsoft common stock, we would provide Yahoo the opportunity to conduct appropriate limited due diligence with respect to Microsoft.  We are prepared to deliver a draft merger agreement to you and begin discussions immediately.

In light of the significance of this proposal to your shareholders and ours, as well as the potential for selective disclosures, our intention is to publicly release the text of this letter tomorrow morning.

Due to the importance of these discussions and the value represented by our proposal, we expect the Yahoo Board to engage in a full review of our proposal. My leadership team and I would be happy to make ourselves available to meet with you and your Board at your earliest convenience.  Depending on the nature of your response, Microsoft reserves the right to pursue all necessary steps to ensure that Yahoo's shareholders are provided with the opportunity to realize the value inherent in our proposal.

- 9 -

We believe this proposal represents a unique opportunity to create significant value for Yahoo's shareholders and employees, and the combined company will be better positioned to provide an enhanced value proposition to users and advertisers. We hope that you and your Board share our enthusiasm, and we look forward to a prompt and favorable reply.

34.      Investors and analysts alike supported a Microsoft-Yahoo deal.  According to an article entitled "*Shareholders Want Microsoft-Yahoo Deal Done – Pronto*" by Betsy Schiffman published on February 8, 2008 on Wired Blog Network, "investors want the deal done already." The article states that: "Yahoo shareholders don't care if Steve Ballmer [Microsoft's CEO] is the emperor of evil, nor do they care about the implications of the merger to Flickr.  The thing that matters most to shareholders is Yahoo's stock price, and that looked awfully ugly before Microsoft came in with its $31 per share offer."  "This is totally insane," Shareholder Value Management analyst Jeff Embersits stated, "There's no way Yahoo's worth $44 billion.  Period. [Yahoo Management] should fall on their knees, kiss the ground and go home and buy Porsches."

35.      Nonetheless, on February 11, 2008, after enacting the severance plans described above and before the market opened, the Yahoo Board issued a press release formally rejecting Microsoft's $31 per share offer.  According to the Company's February 11, 2008 press release, "the Board believes that Microsoft's proposal substantially undervalues Yahoo."

## SEVERANCE PLAN

36.      In response to the Microsoft Offer, the Yahoo Board devised a plan that would give Yahoo's 13,000 full-time employees the right to quit his or her job and pocket generous termination benefits at any time during the two years following a takeover by claiming a "substantial adverse alteration" in job duties or responsibilities.

37.      The proposed severance plan would not benefit employees but instead would frustrate Microsoft's desire for a smooth integration, drive up the cost of an acquisition, deter a proxy fight to change the composition of the Board, incentivize employees to quit after a change of control, and would do nothing to benefit employees whose jobs may be terminated, or whose job duties may be restructured, prior to any change of control or as part of any alternative transaction.

AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

38.     On February 1, the Compensation Committee of the Yahoo Board held a regularly-scheduled meeting with its independent compensation consultant, Compensia, and counsel, as well as Yahoo's senior human resources executives.  That afternoon, the Yahoo Board was advised that the Compensation Committee had directed management to work with Yahoo's takeover defense counsel, Skadden Arps, Slate, Meagher & Flom LLP, to develop a broad retention plan that would be triggered by an employee loss of job following a change-in-control (known as a "double trigger").  The Compensation Committee's compensation consultant was not told about any retention plan proposal until several days later.

39.     Despite suggestions to the contrary from Compensia and Yahoo's Human Resources Director, the Yahoo Board insisted on providing full acceleration of all equity-based compensation ever granted to all employees.  In response to this term, Compensia provided "pushback."  Compensia had calculated that the cost of *partially* accelerated equity for everyone (the most recent proposal by management prior to the proposal of full equity acceleration for everyone) would equal $1.5 billion, or 3.2% of the transaction price.  In an email produced in another litigation, Compensia made clear its view of Defendant Yang's plan to provide 100% equity acceleration for all employees: "That's nuts."

40.     In statements made under oath in another case, Timothy J. Sparks, president of Compensia stated that prior to February 5, he told Yahoo that, based on his prior experience advising acquirers, he was opposed to granting employees the right to resign and claim severance benefits based on changes to their "duties or responsibilities, … [because] those provisions have troubling administrative elements to them."  Acquirers find it difficult to fight severance claims based on such "duties or responsibilities" provisions and often take the path of least resistance, which means interpreting the provision broadly and paying the severance claim.

41.     On February 8, 2008, despite the advice of its own consultants, Compensia, that the plan was "nuts," the Yahoo Board approved the change-in-control severance plans in concept and delegated to the Compensation Committee the authority to adopt the specific details of the plans.  No independent consultant attended the Board meeting or provided an opinion on the plans' cost or scope.  According to the Board book, if Microsoft paid severance benefits to all employees, the

AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

cost of the plan at a $31 per share deal price would be **over $2.1 billion** and at $35 per share would be **almost $2.4 billion**.  The calculations also showed that the great bulk of the expense was for potential severance payments, not for retention incentives to key employees.

42.     On February 12, 2008, the Compensation Committee of the Yahoo Board approved two Change in Control Severance Plans that, together, cover all full-time employees of the Company, including the Executive Officers currently employed by the Company.  Based on a February 8, 2008 e-mail exchange between Defendants Kozel and Kern produced in another litigation, the Yahoo Board was aware that the plans dramatically impacted and potentially lowered the value of any competitive bid to purchase the Company such as the Microsoft Offers.

43.     The Change in Control Severance Plans provide that if an eligible employee's employment with the Company is terminated by the Company without "cause" or voluntarily resigns for "good reason" within two years after a change-in-control of the Company, the employee will generally be entitled to receive the following severance benefits:

- Continuation of the employee's annual base salary, as severance pay, over a designated number of months following the employee's severance date.  The number of months will range from four (4) months to twenty-four (24) months, depending on the employee's job level.

- Reimbursement for outplacement services for twenty-four (24) months following the employee's severance date, subject to a maximum reimbursement that ranges from $3,000 to $15,000, depending on the employee's job level.

- Continued medical group health and dental plan coverage for the period the employee receives severance pay.

- Accelerated vesting of all stock options, restricted stock units and any other equity-based awards previously granted or assumed by the Company and outstanding as of the severance date, unless otherwise set forth in the applicable award agreement for grants or awards made after February 12, 2008.

44.     The Change in Control Severance Plans adopted by the Compensation Committee have the effect of completely disabling the Board's ability to amend or rescind the plans so long as

_____

Microsoft's offer remained pending.  Under the plans, no amendment or rescission of the plans can be made until thirty (30) days *after the* "Potential Change of Control" event — which Microsoft's offer clearly was — has been withdrawn or terminated.  The Yahoo Board disabled itself from amending the severance plans during the pendency of the Microsoft offers and any proxy contest to replace at least a majority of the Board.  The Yahoo Board reserved for itself the right to hire and fire Yahoo employees, without triggering severance payouts.  Employees only get massive severance benefits if someone other than the Yahoo Board controls the Company.

45.     The entire Board was self-interested in the approval of the severance plans. "Change of Control" is defined broadly to include not just an acquisition but also the replacement of a majority of the Board in a proxy contest.  This means that a new board majority, elected by Yahoo's shareholders, faces the risk of massive severance payouts as part of any reduction in force, reorganization or strategic alliance, or even from the natural attrition that would take place in a cutting-edge technology company such as Yahoo in which changes in job duties or responsibilities occur as a matter of course.  Upon the election of a new slate of directors, any employee is incented to resign following a change of duties and make a credible claim for severance benefits.

AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## MICROSOFT'S REPEATED ATTEMPTS TO CONTINUE NEGOTIATIONS

46.     Despite investor and market support once the Microsoft bid was public, the Yahoo Board ignored Microsoft's overtures.  In an April 5, 2008 letter to the Yahoo Board, Microsoft's CEO stated that the Change in Control Severance Plans "made any change of control more costly."  In his April 5, 2008 letter, Ballmer complained that, "While there has been some limited interaction between management of our two companies, there has been no meaningful negotiation to conclude an agreement."  Ballmer observed that while Yahoo was negotiating in search of alternatives, he had seen "no indication that you have authorized Yahoo management to negotiate with Microsoft."  Microsoft's CEO warned that his patience was not endless. Absent "an agreement within the next three weeks, we will be compelled to take our case directly to your shareholders, including the initiation of a proxy contest to elect an alternative slate of directors for the Yahoo Board."  In such an event, "that action will have an undesirable impact on the value of your company from our perspective which will be reflected in the terms of our proposal."

47.     On April 7, 2008, Yahoo's Board once again rejected Microsoft, although it claimed Yahoo was open to a higher price.

48.     According to an April 12, 2008 comment by Eric Savitz at Barrons:  "Nothing has changed, Microsoft's offer is still much more than Yahoo shareholder are likely to get elsewhere, especially if the price goes up."  As Henry Blodget in an April 12, 2008 article entitled "Yahoo-Microsoft Done Deal, Only Question is Price, Unless MSFT Walks" on Adsensetrick.com noted: "Unfortunately there is still at some risk that this melodrama will end by Microsoft walking – in which Yahoo's stock will drop to $20."

49.     As of April 15, 2008, *CNBC.Com* reported that "little time" was spent on a value of the deal" and "according to people familiar with the matter, executives at Microsoft were in apparent disbelief at the lack of negotiation of any kind, whether on the phone or face to face.  As of April 18, the Yahoo Board purportedly wanted $40 a share.

50.     On April 22, 2008, Yahoo reported its financial results for the first quarter of 2008, which included a decrease in operating income for both the U.S. and International segments and a decrease in revenues in the International Segment.

51.   On April 26, 2008, Microsoft's three-week deadline set forth in the April 5, 2008 letter to the Yahoo Board passed with no meaningful communication.  However, two days later, Defendant Yang communicated to Microsoft that Yahoo would be willing to take $38 per share but Microsoft responded that the price was still too high especially after Yahoo lackluster earnings report on April 22, 2008.

52.   On May 1, 2008, Forbes.com quoted Matt Rosoff, an analyst at the research firm Directions on Microsoft: "A friendly, negotiated deal is more likely, unless Yahoo is being totally unrealistic about price … A hostile takeover causes [employees] to leave."

53.   On May 2, 2008, Microsoft chief counsel Brad Smith called Yahoo's bankers and said that Microsoft was prepared to offer $33 a share in order to get the deal done friendly and quickly.  The Yahoo Board ignored the $33 per share offer with no call-back.  CNBC.COM reported on May 4, 2008 that "a source close to Microsoft says no questions of any kind were asked, such as whether the $33 a share would be all cash, or whether there would be a stock component.  There was simply no communications."

54.   According to published reports, Defendant Yang and David Filo flew to Seattle to meet with Microsoft's CEO.  Based on a CNBC.COM report, a source at Microsoft confirmed that the Yahoo Board was willing to accept $37 but that Yang's and Filo's price was still at $38.  A Microsoft source says that Microsoft became convinced that the deal was hostile and Yahoo would prefer to destroy its brand rather than let this deal move forward.

55.   According to a May 3, 2008 Bloomberg Report, another analyst called Defendant Yang's conduct: "Unbelievable.  This is management putting its employees and its job security ahead of current Yahoo shareholders' interest."

56.   On May 5, 2008, CNBC.com reported that:

Microsoft is walking away from its $42 billion unsolicited bid for **Yahoo**, capping three months of sometimes lax, sometimes intense, but always contentious negotiations between the two.

* * *

Laura Marin, a senior analyst at Soleil Securities, told Reuters Yahoo was demanding too high a price and she expected its shares to fall $8 on Monday when trading resumes on the Nasdaq.

- 15 -

The Yahoo guys want too much money for their company.  We think $33 a share is fair in the context of the weakening economic environment and adverse advertising trends, said Martin, who has a "hold" rating on Yahoo shares.

57.     Shareholders and the market were decidedly unhappy about the Yahoo Board and its handling of the Microsoft Offers.  Bill Miller, a portfolio manager for Legg Mason and Yahoo's second largest shareholder, was quoted on May 5, 2008 in the *New York Times* and *The Deal.Com* as stating that he would have considered selling if Microsoft's bid was just over $33 a share, but he did not agree with the bid of $37 a share that the Yahoo Board demanded.  Eric Jackson ("Jackson"), the leader of a group called Plan B, 140 Yahoo shareholders who collectively owned 2 million Yahoo shares put out a video asking Yahoo shareholders to withhold votes for all Yahoo directors due to the failed Microsoft deal and to vote for a change in the Board and management.

58.     On May 5, 2008, following Microsoft's withdrawal of its offer, Yahoo's stock price immediately dropped about 20 percent, ultimately closing down $4.30 per share (15%) at $24.37, some 26% less than Microsoft's $33 per share offer to acquire the Company.  CBS News 11 quoted Darren Chervitz, co-manager of Jacob Internet Fund, which owns Yahoo stock, as stating: "Clearly there's frustration, I am not even sure if Yahoo cares about its shareholder because they didn't show much regard for the shareholders' best interest in this process."  Standard & Poor's analyst, Steve Kessler, was quoted as stating that Defendant Yang should use some of his estimated $1.9 billion fortune to personally buy more Yahoo stock even though he already owns 54.1 million shares, or 3.9 percent of the company."  "Jerry Yang really needs to put his money where he is mouth is," Kessler said, 'If he really thinks Yahoo is worth $37 (per share), then he needs to step up and buy some shares when they are in the low $20."

59.     Gordon Crawford of the Capital Research Group, Yahoo's largest shareholder, owning about 16% of Yahoos shares through funds he manages, and one of the country's most respected media investors, told *The Wall Street Journal* and other sources that he is "extremely disappointed" by Yang's performance and is "even more disappointed in the independent directors who were not responsive to the needs of independent shareholders."

- 16 -

60.     On May 5, 2008, *The Wall Street Journal* reported that "[t]he analyst community" was lowering price targets for Yahoo stock, and some had "downgraded shares entirely."  One analyst explained a Yahoo downgrade as follows: "In our view, companies that ignore the best interests of shareholder in favor of the interests of other stakeholders (particularly management) deserve to (and typically do) trade at a significant discount to peers."

## PROXY BATTLE

61.     On June 9, 2008, Yahoo filed with the SEC a Definitive Proxy Statement pursuant to Section 14(a) of the Securities & Exchange Act of 1934.  The June 9, 2008 Proxy Statement was a solicitation on behalf of the Yahoo Board and was approved by them.

62.     In support of the re-election of the existing Yahoo Board, the June 9, 2008 Proxy Statement stated:

> *Change in Control Severance Plans.*  On February 12, 2008, the Compensation Committee approved two change in control severance plans (the "Change in Control Severance Plans") that, together, cover all full-time employees of the Company, including each of the Named Executive Officers currently employed by the Company. On January 31, 2008, the Company received an unsolicited proposal from Microsoft Corporation ("Microsoft") to acquire the Company.  On February 11, 2008, the Company issued a press release indicating that its Board of Directors had unanimously concluded that the proposal was not in the best interest of the Company and our stockholders.  The Change in Control Severance Plans are designed, in light of the uncertainty caused by the Microsoft proposal, to help retain the Company's employees, maintain a stable work environment, and provide certain economic benefits to the employees in the event their employment is actually or constructively terminated in connection with a change in control of the Company. The material terms of the Change in Control Severance Plans are described below in the section entitled "New 2008 Change in Control Severance Plans."  Compensia advised the Company and F.W. Cook & Co. advised the Compensation Committee with respect to the terms of the plans.

Yahoo! Inc., Proxy Statement Pursuant to Section 14(a) of the Securities Exchange Act of 1934 (Schedule 14A), at *38-39 (June 9, 2008).

63.     According to the June 9, 2008 Proxy Statement, a "change in control" under the Change in Severance Plans would be triggered by "by a person or group of persons acquiring more than 40% of the Company's voting stock, certain changes in the membership of the Board of Directors …, certain mergers and other transactions where the Company's stockholders owned less than 50% of the surviving entity, a liquidation of the Company or a sale of all or substantially

- 17 -

all of its assets, or any other transaction deemed by the Board of Directors or the Compensation Committee to constitute a change in control of the Company."

64.    On June 10, 2008, Yahoo filed a supplemental statement to its June 9, 2008 Proxy Statement which included Q&A session relating to the severance plan.  The Company's answers as filed with the SEC appear below:

**Why has Yahoo! instituted the Plan?**

Attracting and retaining talent has always been a top business priority for the company. We cannot execute against our big bets and ongoing priorities without an engaged and talented workforce.  The Plan is intended to help us retain valued Yahoos during a period of uncertainty, maintain a stable work environment for our Yahoos and provide economic benefits to eligible employees in the event of potential job eliminations following a Change in Control.

**Did Yahoo! adopt the Plan to thwart a deal with Microsoft? Does having a plan like this jeopardize a potential deal in any way?**

No.  The Plan is intended to help retain valued employees and preserve the value of Yahoo! during a period of uncertainty, without acting as a barrier to a Change in Control.   We believe retaining valued Yahoos would be consistent with any acquiror's goals.

**Is the Plan a "poison pill"?**

No.  The term "poison pill" is widely understood to refer to stockholder rights plans which work by allowing existing stockholders (except the acquiror) to buy more shares at a substantial discount to the then current share price of the target if the acquiror purchases above a specified level of stock of the target (usually 15%) without the consent of the target's board.  As a result, this substantially dilutes the acquiror's holdings and makes the acquisition much more expensive.  The Plan, which is designed to preserve the value of Yahoo! during a period of uncertainty, has no such purpose or effect.

**Mr. Icahn says this Plan costs $2.4 billion. Is that what it actually costs?**

No. An estimate of the amount, if any, payable under the Plan requires making assumptions about unknown facts and variables including: (1) the number of employees who terminate employment without Cause or for Good Reason within the two years following any Change in Control, (2) each such employee's job level and base salary, (3) the number of equity awards held by each such employee on their respective severance date, the portion of those awards that are not otherwise vested on that date, and the applicable exercise price of any option awards, (4) the market price of the Company's common stock at the time such awards are ultimately exercised or paid, and (5) the length and level of reimbursement for health care benefits and outplacement services utilized by each such employee.

- 18 -

Mr. Icahn quotes the $2.4 billion estimate, taken out of context, from a complaint filed in litigation against the company. This number is necessarily based on a number of assumptions, including the assumption that all of Yahoo!'s employees are terminated without Cause or leave for Good Reason following a Change in Control. No one believes that such an assumption is reasonable. For the record, the same preliminary analysis referenced in the lawsuit and relied on by Mr. Icahn and using the same assumptions (including a $35 per share stock price) as those underlying the $2.4 billion figure showed that the total payout would be $845 million or $514 million, assuming that 30% or 15% of the employees, respectively, are terminated without Cause or leave for Good Reason following a Change in Control.

**Did Yahoo!'s compensation consultant say that the Plan is "nuts"?**

No. As indicated above, estimating the cost of the Plan requires making a number of assumptions. Timothy J. Sparks, the president of Compensia, Yahoo!'s compensation consultant firm, explained in a sworn deposition that he used the word "nuts" to describe his opinion of using the assumption that 100 percent of Yahoo!'s employees would actually receive the severance benefits under the Plan to determine cost estimates. Mr. Sparks made clear in his deposition that his remark did not relate to the design or cost of the Plan.

Yahoo! Inc., Proxy Statement Pursuant to Section 14(a) of the Securities Exchange Act of 1934 (Schedule 14A) (June 10, 2008).

65.     The Proxy Statement falsely stated that the severance plans were designed to help retain the Company's employees, maintain a stable work environment and provide certain economic benefits to the employees in the event their employment is actually or constructively terminated in connection with a change-in-control of the Company. Instead, the severance plans were designed to defend against and to interfere with the Microsoft Offers and any attempt by Microsoft or any other potential offeror for an orderly integration of the two companies. These change of control provisions provide no economic benefit to employees in the event of any reduction in force, reorganization, or alternative transaction in lieu of a sale to Microsoft and may trigger tax liabilities for employees who resign and receive severance. The proxy statement is also false and misleading as to the potential total cost of the severance plans. Yahoo fails to disclose that according to its own internal estimates, the severance plans added $462 million to $2.1 billion to Microsoft's costs based on Microsoft's initial offer of $44.4 billion or $31 per share. Microsoft could have bid higher if Yahoo had not adopted such an aggressive program.

- 19 -

66.     The June 9, 2008 Proxy Statement misleadingly states on page 39 that "Compensia advised the Company and F.W. Cook & Co. advised the Compensation Committee with respect to the terms of the plans."  Yahoo! Inc., Proxy Statement Pursuant to Section 14(a) of the Securities Exchange Act of 1934 (Schedule 14A), at *39 (June 9, 2008).

67.     The Proxy misleadingly omits that Compensia advised against allowing an employee to obtain severance benefits by claiming a change in the employee's duties or responsibilities following a change of control.  Compensia was not asked to attend any Board or Compensation Committee meeting relating to the severance plans and did not render any opinion on that subject for the benefit of Yahoo Board.

## FURTHER EFFORTS TO THWART MICROSOFT OFFERS: GOOGLE

68.     As part of the Yahoo Board's further efforts to fend off the Microsoft Offers, Yahoo entered into an advertising partnership with Google.  In April 2008, at the height of the Microsoft-Yahoo talks, Google and Yahoo conducted a two week trial which confirmed that Google's technology would generate more revenue for Yahoo than its own system, which had cost more than $2 billion to acquire and improve.

69.     Almost immediately, on April 23, 2008, Reuters reported that the U.S. Justice Department was investigating the Google-Yahoo test:

> The Justice Department is concerned the test may violate antitrust law, the source said, adding that authorities "have initiated an investigation" of it.
>
> *The source, who spoke on condition of anonymity, said some of the government's concern focused on a telephone call from Google Chief Executive Eric Schmidt to Yahoo Chief Executive Jerry Yang to offer help in thwarting Microsoft's bid worth around $44 billion.*
>
> *The test was one of a series of efforts by Yahoo to fend off Microsoft's unwelcome bid.*
>
> A second source said the Justice Department was concerned about a longer-term deal between Google and Yahoo, and had an initial inquiry underway into the matter.

(Emphasis added).

70.     Nonetheless, in May 2008, Yahoo decided to pursue a partnership with Google which would give Yahoo and Google, according to some accounts, control over 90% of the search

AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

ad market.  Yahoo's advertising partnership with Google could not even start until late September because the companies voluntarily agreed to wait for the government to review a deal involving the two largest players in search advertising.

71.    Yahoo's largest investors recognized the Google outsourcing deal as a desperate ploy.  Bill Miller, the Legg Mason fund manager who is Yahoo's second-largest investor, with 92 million shares as of April 2008, was quoted as saying that outsourcing to Google "vitiates the Panama platform" and "would destroy the ecosystem of search."

72.    The real effect of a Google-Yahoo deal, however, was to erect insurmountable obstacles to Microsoft's bid for Yahoo.  Even if a Yahoo-Google deal passed antitrust muster, which was unlikely, any arrangement among Microsoft, Yahoo and Google would be impossible from an antitrust prospective and any effort to undo a Yahoo-Google deal would be uncertain, prolonged and highly disruptive.

73.    On May 4, 2008, Ballmer sent a letter to Yang formally withdrawing Microsoft's offer.  In this letter Ballmer states flatly that Yahoo's threat to outsource search to Google was one of the principal reason deterring Microsoft from pursing a "hostile" bid for Yahoo.

74.    A May 7, 2008 op-ed in *The Wall Street Journal* identified Yang's personal agenda and his conduct vis-a-vis Microsoft's offer as the reason why no deal was struck:

> In a fashion, [Yang] outsmarted not only Mr. Ballmer but his own Yahoo shareholders and board.  Having discovered how much Yahoo was worth to Redmond (and no one else), he set about destroying that unique value by ceding Yahoo's position in search to Google through an outsourcing deal.
>
> ***All this so Jerry Yang can fulfill his dream of having an independent Yahoo whose halls he can continue to walk as the revered "founder."***

(Emphasis added).

75.    Standard & Poor's equity analyst Scott Kessler was by quoted by CBS news on June 12, 2008 in response to the news that Yahoo was embracing Google after ending Microsoft talks as stating: "If you are a Yahoo shareholder, you just have to be scratching your head right now."

## PROXY BATTLE OVER REJECTION OF THE MICROSOFT OFFERS

- 21 -

76.    Upset with the Yahoo Board's response to the Microsoft Offers, the Icahn Group, a substantial shareholder in Yahoo, decided to challenge the Yahoo Board.  According to a Form 3, filed with the SEC on August 1, 2008, and Icahn Partners LP, Icahn Partners Master Fund LP, Icahn Partners Master Fund II L.P., Icahn Partners Master Fund III L.P., High River Limited Partnership and Carl C. Icahn (collectively, the "Icahn Group") held 68,786,320 shares of Yahoo.

77.    On May 15, 2008, Icahn sent a letter to Defendant Bostock and wrote that outraged Yahoo shareholders had urged him to lead a campaign to replace the Yahoo Board at the Company's July 3, 2008 annual meeting in the hopes of bringing Microsoft back to the negotiating table.  Icahn wrote:  "I believe that a combination between Microsoft and Yahoo is by far the most sensible path for both companies. …  It is irresponsible to hide behind management's more than overly optimistic financial forecasts.  It is unconscionable that you have not allowed your shareholders to choose to accept an offer that represented a 72% premium over Yahoo's closing price of $19.18 on the day before the initial Microsoft offer."  The Icahn Group then formally notified the Company of their intention to nominate ten nominees for election at the Annual Meeting.

78.    On June 4, 2008, the Icahn Group sent another letter to the Yahoo Board asking them to remove the Change In Control Severance Plans because it was a major deterrent to the Microsoft Offers.  The June 4, 2008 Icahn Group letter further stated: "It is also time to admit to your shareholder that the severance plan was not done for your employees (who you conveniently neglected to inform that Microsoft had earmarked $1.5 billion in retention incentives for) but rather was done simply as an entrenchment device and to impede a Microsoft bid."  The letter concluded: "Until now I naively believed that self-destructive doomsday machines were fictional devices found only in James Bond movies.  I never believed that anyone would actually create and activate one in real life.  I guess I never knew about Yang and the Yahoo Board."

79.    The June 9, 2008 Proxy Statement recognized that "the Icahn Entities have provided notice that they intend to nominate their own slate of nine (9) nominees for election as directors at the annual meeting."  The June 9, 2008 Proxy Statement also noted that: "Under the Change in Control Severance Plans, a change-in-control is deemed to have occurred if the

- 22 -

members of the Board of Directors as of February 12, 2008 (and any new directors whose appointment, election or nomination to the Board of Directors was approved or recommended by a vote of at least two-thirds of the directors then in office who were either directors on February 12, 2008 or whose appointment, election or nomination for election was previously so approved or recommended) cease for any reason to constitute a majority of the Board of Directors. If five or more of the Icahn Nominees are elected to the Board of Directors at the annual meeting, a change-in-control will be deemed to have occurred for purposes of the Change in Control Severance Plans."

80.   On July 7, 2008, Market Watch quoted Microsoft as stating that "it is open to discussing a 'major transaction' with a new board of directors at [Yahoo]." According to the report, Microsoft held talks with the Icahn Group. Microsoft said it would not hold any further talks with the current Yahoo Board, "We have concluded that we cannot reach an agreement with them."

81.   On July 13, 2008, Yahoo again rejected an offer from Microsoft that was proposed by the Icahn Group and Microsoft for the restructuring of Yahoo which would entail Microsoft acquiring Yahoo's search engine. The Yahoo Board concluded that the sale of Yahoo's core strategic assets to Microsoft would be disadvantageous to Yahoo shareholders. Yahoo also signed an agreement with Google with a $250 million termination fee, and also agreed not to sell the Yahoo search engine to Microsoft.

82.   A week later, on July 21, 2008, the Yahoo Board and the Icahn Group entered into an agreement to settle the proxy contest pertaining to the election of directors to the Yahoo Board at the Company's August 1, 2008 annual meeting of stockholders. Under the Settlement Agreement, the Icahn Group withdrew their notice of intention to nominate certain individuals for election as directors at the Annual Meeting, agreed to immediately cease all efforts related to their own proxy solicitation and agreed to vote, or cause to be voted, all shares of the Company's common stock beneficially owned by them for all of the directors nominated by the Board. The Company agreed that the number of seats on the Board will be increased to 11, Carl Icahn will be appointed to serve as a director of the Company until the Company's 2009 annual meeting of

stockholders, and the Board will appoint two more individuals to serve as directors of the Company until the 2009 Annual Meeting.

83.     In accordance with the Settlement Agreement, on August 14, 2008, the Yahoo Board appointed Frank J. Biondi, Jr. and John H. Chapple to the Yahoo Board.

## SUBSTANTIVE ALLEGATIONS

## FALSE AND MISLEADING PROXY STATEMENT

84.     The June 9, 2008 Proxy had the following purposes:

1.      To elect nine (9) directors of the Company to serve until the 2009 annual meeting of stockholders or until their respective successors are elected and qualified;

2.      To ratify the appointment of PricewaterhouseCoopers LLP as the independent registered public accounting firm for the Company for the fiscal year ending December 31, 2008;

3.      To vote upon three proposals submitted by stockholders, in each case if properly presented at the annual meeting.

85.     One of the three shareholder proposals submitted by stockholders was Shareholder Proposal No. 3 which stated as follows:

**Stockholder Proposal**

**Pay-for-Superior-Performance Principle Proposal**

*Resolved:  That the shareholders of Yahoo! Inc. ("Company") request that the Board of Director's Executive Compensation Committee adopt a pay-for-superior-performance principle by establishing an executive compensation plan for senior executives ("Plan") that does the following:*

- *Sets compensation targets for the Plan's annual and long-term incentive pay components at or below the peer group median;*

- *Delivers a majority of the Plan's target long-term compensation through performance-vested, not simply time-vested, equity awards;*

- *Provides the strategic rationale and relative weightings of the financial and non-financial performance metrics or criteria used in the annual and performance-vested long-term incentive components of the Plan;*

- *Establishes performance targets for each Plan financial metric relative to the performance of the Company's peer companies; and*

- *Limits payment under the annual and performance-vested long-term incentive components of the Plan to when the Company's performance on*

- 24 -

*its selected financial performance metrics exceeds peer group median performance.*

*Supporting Statement: We feel it is imperative that executive compensation plans for senior executives be designed and implemented to promote long-term corporate value. A critical design feature of a well-conceived executive compensation plan is a close correlation between the level of pay and the level of corporate performance. The pay-for-performance concept has received considerable attention, yet all too often executive pay plans provide generous compensation for average or below average performance when measured against peer performance. We believe the failure to tie executive compensation to superior corporate performance has fueled the escalation of executive compensation and detracted from the goal of enhancing long-term corporate value. Post-employment benefits provided to executives from severance plans and supplemental executive pensions exacerbate the problem.*

*We believe that the pay-for-superior-performance principle presents a straightforward formulation for senior executive incentive compensation that will help establish more rigorous pay for performance features in the Company's Plan. A strong pay and performance nexus will be established when reasonable incentive compensation target pay levels are established; demanding performance goals related to strategically selected financial performance metrics are set in comparison to peer company performance; and incentive payments are awarded only when median peer performance is exceeded.*

*We believe the Company's Plan fails to promote the pay-for-superior-performance principle in several important ways. Our analysis of the Company's executive compensation plan reveals the following features that do not promote the pay-for-superior-performance principle:*

- *Total compensation is targeted above the peer group median.*
- *The annual incentive award for the Named Executive Officers ("NEOs") is not based on predetermined performance criteria.*
- *100% of the CEO's and a majority of the other NEO's long-term compensation is not performance-vested.*
- *Target performance levels for the performance-based restricted stock unit metrics are not disclosed and are not peer group related.*
- *The CEO's stock options vest incrementally over three years.*

*We believe a plan designed to reward superior corporate performance relative to peer companies will help moderate executive compensation and focus senior executives on building sustainable long term corporate value."*

86.    The Yahoo Board recommended that Stockholders vote against the pay for performance resolution:

- 25 -

**Board of Directors Statement AGAINST Stockholder Proposal**

The Board of Directors has carefully considered the foregoing proposal.  The Board believes that the proposal fails to take into account the fact that our Chief Executive Officer, Mr. Yang, received a nominal annual salary of only $1 for 2007, continues to have a $1 base salary rate, did not receive any bonus or other compensation from the Company in 2007, and was not granted any stock options or other long term equity incentive awards by the Company in 2007.  Because he is one of our largest stockholders, a substantial portion of Mr. Yang's net worth is already tied to the performance of our stock.

While the Board strongly supports the principle that performance-based arrangements should form a significant portion of the compensation opportunities for executives, the Board does not believe that the strict weighting and benchmarking of the type called for by the stockholder proposal is advisable given that this type of benchmarking is inconsistent with the compensation practices followed by the majority of the companies with which Yahoo! competes for executive talent.  The Board believes that, if the policy described in the stockholder proposal was adopted, the Company could be placed at a substantial competitive disadvantage in attracting and retaining the most qualified executives.  **In order to support Yahoo!'s future growth strategy in a competitive labor market, the Board believes it is imperative that the Compensation Committee retain the flexibility to determine compensation types and levels that appropriately balance the Company's need to attract and retain qualified executives with its goal of choosing incentives that best align the interests of Yahoo!'s executives with those of its stockholders.**

Further, the Board believes that performance-based arrangements already constitute a significant portion of the compensation opportunities for Yahoo!'s executive officers (other than Mr. Yang, who receives virtually no direct compensation for his services).  **For all of our other executive officers, greater than 88% of each executive's annual direct compensation already depends upon the achievement of financial goals, individual performance and/or Yahoo!'s stock price. (We use the phrase "direct compensation" to mean base salary, annual incentive bonus, and long-term equity incentive awards.  For this purpose, long-term equity incentive award values are based on the grant-date fair value of the awards as determined in accordance with generally accepted accounting principles and SEC rules.)**

Annual incentive bonuses comprise the cash component of the Company's performance-based compensation arrangements for our executives and are intended to reward the achievement of financial, strategic and operating objectives for the applicable year. In determining annual bonus amounts, the Compensation Committee has historically considered multiple performance criteria, including evaluations of the executive's personal job performance and the Company's performance measured against its annual business and financial plans and other financial goals. Although the Board believes that Yahoo!'s financial performance relative to its peer companies should be (and is) a factor in determining executive officers' compensation levels, the Board also believes that the Compensation

- 26 -

Committee should have flexibility to determine annual bonuses for Yahoo!'s executives without requiring rigid performance metrics set in relation to peer company performance.

The Board believes requiring that performance targets be established relative to peer companies could shift executives' focus from long-range growth to short-term comparisons and would place Yahoo! at a substantial competitive disadvantage, particularly in light of the highly competitive nature in Yahoo!'s industry for talent, because Yahoo!'s competitors are not subject to these constraints. Further, the Board believes that Yahoo! should be able to reward its executives for good performance even if its peer companies also do well, particularly since, as described on page 35, it is difficult to identify a single comparable peer to the Company given the breadth of the Company's business and the rapidly changing environment in which the Company competes. Given the dynamic nature of Yahoo!'s business, it is important that the Compensation Committee have the flexibility to determine appropriate performance goals according to changes in Yahoo!'s business and industry that occur each year and to evaluate how well Yahoo! and its executives are able to adapt to those changes each year without requiring specific links to peer performance.

The equity-based components of the Company's executive compensation program ensure that a significant portion of the executive's wealth accumulation opportunities is tied to long-term stock price appreciation that, among other things, promotes the executive's focus on the long-term financial performance of the Company. For example, in 2007, equity-based awards granted to the Company's executive officers (other than Mr. Yang who received only his $1 base salary) directly linked approximately 82% to 92% of each executive's annual direct compensation to the performance of the Company's stock over the vesting period. The awards granted to executive officers in 2007 consisted of a mixture of stock options and restricted stock units. Restricted stock units are inherently performance-based because the value of the awards is tied directly to the Company's stock price. In addition, in recent years, the Company has also awarded performance-based restricted stock units to executives which vest only if performance goals established in advance by the Compensation Committee are satisfied. Stock options, even those that vest based on continued employment, are also inherently performance-based because the stock options have value only if the Company's stock price increases after the grant date.

The Board believes these awards create powerful incentives for our executives to maximize the Company's performance and create value for our stockholders. The Board also believes that the terms of the Company's equity-based awards are generally consistent with the practices followed by the majority of the companies with which Yahoo! competes for executive talent. The policy described in the stockholder proposal would limit the Company's ability to grant these types of awards on these terms. Given the importance of granting equity-based awards on "market" terms to our executives and potential executives, the Board believes that the Company could be placed at a substantial competitive disadvantage in attracting and retaining the most qualified executives if the Company were to adhere to the

- 27 -

policy described in the stockholder proposal.

**The Compensation Committee is comprised entirely of independent directors and reviews Yahoo!'s compensation program on an ongoing basis and has retained a compensation consulting firm to assist in the development and review of Yahoo!'s compensation practices. This firm does no other work for Yahoo! or management that is unrelated to executive compensation advisory services. The Compensation Committee has also retained independent attorneys to advise it on compensation matters. As part of this review, the Compensation Committee examines competitive data provided by its compensation consulting firm. Competitive market data compares our compensation practices to select Internet-related, technology and media companies, companies with which we compete for executive talent and other relevant companies. The Board strongly believes that the Compensation Committee's approach to date has provided appropriate links between executive compensation and Yahoo!'s performance and has aligned the interests of executives with those of its stockholders. It also provides the Compensation Committee with the necessary flexibility to address rapidly changing situations and environments.**

**Recommendation of the Board of Directors**

**FOR ALL OF THE FOREGOING REASONS, THE BOARD OF DIRECTORS RECOMMENDS THAT STOCKHOLDERS VOTE "AGAINST" THIS PROPOSAL. PROXIES RECEIVED BY THE COMPANY WILL BE VOTED "AGAINST" THIS PROPOSAL UNLESS THE STOCKHOLDER SPECIFIES OTHERWISE IN THE PROXY.**

(Emphasis Added).

87.    Even though George Paulin of Frederic W. Cook & Co. was the independent advisor to the Compensation Committee, and even though Paulin had recently testified before Congress about the importance of Compensation Committees relying on independent advice, and rather than relying on advisors beholden to management, the Yahoo Board and its Compensation Committee had left Paulin in the dark about its employment practices.

88.    On February 6, 2008, Paulin had caustically commented to Defendant Kern, that "at this point l feel like I am functioning as a fifth wheel at Yahoo anyway." Paulin's involvement in Yahoo's compensation was very limited and Paulin testified that he did not offer any advice or guidance or analysis related to lower level employees outside of the senior management group.

89.    During the consideration of relevant compensation plans, the Proxy fails to disclose that neither Compensia nor F.W. Cook & Co. attended any relevant meeting of the Board or

AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1  Compensation Committee or rendered any opinion for the benefit of Yahoo Board or any of its

2  directors.

3        90.     The June 9, 2008 proxy statement also misleadingly states on page 21, with regard

4  to the shareholder proposal, that the Compensation Committee uses its independent advisors "to

5  assist in the development and tax review of Yahoo's compensation practices" and that the

6  Compensation Committee's approach supplies "appropriate links between executive compensation

7  and Yahoo!'s performance."

8  **The Delaware Actions**

9        91.     In Delaware Chancery Court, two purported class actions captioned *Wayne County*

10  *Employees Retirement System v. Yang, et al.*, Case No. 3538-CC, and *Dicke v. Yahoo! Inc., et al.*,

11  Case No. 3539-CC, were filed on February 11, 2008 ("DE Plaintiffs"), on behalf of a putative

12  class of shareholders of nominal defendant Yahoo, challenging the response of the Board of

13  Directors of Yahoo (the "Board"), namely, Jerry Yang, Roy J. Bostock, Ronald W. Burkle, Eric

14  Hippeau, Vyomesh Joshi, Arthur Kern, Robert A. Kotick, Edward R. Kozel, Mary Agnes

15  Wilderotter, and Gary L. Wilson to a merger proposal by Microsoft Corporation.

16        92.     On February 21, 2008, the DE Plaintiffs filed a Verified Class Action Complaint

17  captioned *Police and Fire Retirement System of the City of Detroit v. Yahoo! Inc., et al.*, Case No.

18  3561-CC, against the defendants challenging the Board's response to the merger proposal by

19  Microsoft, including the Board's adoption of two Change in Control Employee Severance Plans

20  that, together, bound Yahoo to certain severance-related benefits for all of Yahoo's full-time

21  employees, which Plaintiffs alleged constituted an unreasonable deterrent to Microsoft or any

22  other bidder.

23        93.     On February 27, 2008, two purported class actions captioned *Plumbers and*

24  *Piperfitters Local Union No. 630 Pension-Annuity Trust Fund v. Yang, et al.*, Case No. 3578, and

25  *Mercier v. Yahoo! Inc., et al.*, Case No. 3579-CC, were also filed in the Delaware Chancery Court,

26  each on behalf of a putative class of shareholders of Yahoo, challenging the Board's response to

27  the merger proposal by Microsoft.

28        94.     On March 5, 2008, the Delaware Chancery Court entered an Order of

- 29 -

AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Consolidation designating the law firms of Bernstein Litowitz Berger & Grossmann LLP and Bouchard Margules & Friedlander, P.A. as plaintiffs' Lead Counsel ("Lead Counsel") for the DE Plaintiffs and designating the complaint filed by DE Plaintiffs as the operative complaint. Three putative class actions were consolidated under the caption *In re Yahoo! Shareholders Litigation*, Cons. C.A. No. 3561-CC. An Amendment To Order Of Consolidation was entered by the Delaware Chancery Court on March 12, 2008 that consolidated two additional class actions into C.A. No. 3561-CC.

95.     According to Yahoo's SEC filings, as of August 14, 2008, Yahoo spent $36 million in fending off the Microsoft Offers including the Icahn Group proxy battle. Yahoo used the services of Skadden Arps, Goldman Sachs, Lehman Brothers and Moelis & Co. This report only factored in funds expended through June of 2008.

96.     On September 4, 2008, after the Yahoo Board rejected a bid of $33.00 in May 2008, a 72% premium over Yahoo's closing price of $19.18 before the initial Microsoft offer, Yahoo's common stock sank to its lowest levels in five years. Shares for Yahoo fell to $17.75 – a price unseen since October 2003. The drop in Yahoo's share value left Yahoo's market about $12 billion below what shareholders would have received if the Yahoo Board had accepted Microsoft's takeover bid of $33 per share in May 2008.

97.     On September 9, 2008, *Fortune* reported that the planned advertising partnership between Google and Yahoo was headed for a federal antitrust challenge. According to Stifel Nicolaus, an analyst at Blair Levin, it would make more sense for Google to withdraw from the partnership rather than fight.

98.     On October 2, 2008, Yahoo closed at $15.58 – giving Yahoo a market capitalization of $22.08 billion – almost exactly half of what the Yahoo Board could have gotten had the company accepted the takeover bid from Microsoft at the beginning of February 2008.

99.     On October 17, 2008, the Atlanta Business Chronicle quoted Microsoft's CEO, who was speaking at an event in Florida, as stating: "We offered 33 bucks not too long ago and it's $11 today [referring to Microsoft's bid of $33 a share or $4.6 billion, which Yahoo rejected]

AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

They probably still think it's worth more than $33 a share."   Microsoft also released a two sentence statement stating it "has no interest in acquiring Yahoo."

100.    On November 5, 2008, the U.S. Justice Department announced that it planned to file a lawsuit to block the Yahoo-Google partnership, under which Google would have placed its more lucrative ads on Yahoo searches.  Google then announced that it pulled out of the partnership rather than face a protracted legal fight.

101.    Over nine months after Microsoft made its initial offer and the Yahoo Board rejected it, on November 5, 2008, Defendant Yang was quoted in the media as stating that Microsoft should make another bid for Yahoo.  "The best thing for Microsoft to do is to buy Yahoo," Yang said during an appearance at a technology conference in San Francisco, "At the right price, whatever that price is."

102.    The damage, however, was done.  On November 6, 2008, Microsoft's CEO discussed the Yahoo offer with business analysts in Sydney Australia and stated: "We made an offer, we made another offer, and it was clear that Yahoo didn't want to sell the business to us and we moved on," said.  "We are not interested in going back and re-looking at an acquisition.  I don't know why they would be either, frankly.  They turned us down at $33 a share."  According to news reports, Microsoft's CEO stated: "I'm sure there are still some opportunities for some kind of partnership around search, but I think (an) acquisition is a thing of the past,"

103.    According to Analyst Roger Kay of Endpoint Technologies Associates said Microsoft's reluctance to negotiate was not surprising.  "Yahoo is such a damaged property by now, and no one wants to do business with Yang, who has proven fairly treacherous in negotiations and no one wants to waste their breath."

104.    On November 7, 2007, Yahoo shares fell $1.76 to close Friday at $12.20 and Microsoft shares gained 3 percent to $21.50.

105.    According to Yahoo's Form 10-Q filed with SEC on November 7, 2008, Yahoo paid outside advisors a total of $110 million for services relating to negotiations with Microsoft and Google.

Income from operations for the three and nine months ended September 30, 2008

- 31 -

includes incremental costs of $37 million and $73 million, respectively, for outside advisors related to Microsoft Corporation's ("Microsoft") proposals to acquire all or a part of the Company, other strategic alternatives, including the Google agreement, the proxy contest, and related litigation defense costs.

Yahoo! Inc., Quarterly Report Pursuant to Section 13 or 15(a) of the Securities Exchange Act of 1934 (Form 10-Q), at *30 (Nov. 7, 2008).

## THE DECEMBER 18, 2008 DELAWARE SETTLEMENT

106.    On December 9, 2008, the parties submitted an unsigned version of the Stipulation and Agreement of Settlement (the "Stipulation") to the Delaware Chancery Court, and advised the Delaware Chancery Court that the amendments to the Severance Plans contemplated by the Stipulation would become effective upon the signing of the Stipulation.

107.    On December 10, 2008, as part of a stipulation and agreement of settlement (the "Settlement Agreement") entered into with the DE Plaintiffs in the In re Yahoo! Shareholders Litigation pending before the Delaware Court of Chancery (the "Delaware Court"), Yahoo! Inc. (the "Company") amended its change in control severance plans originally approved on February 12, 2008 (the "Original Severance Plans" and the Original Severance Plans, as amended, the "Amended Severance Plans").    The Amended Severance Plans, together, cover all full-time employees of the Company, including the Company's Chief Executive Officer, Chief Financial Officer and the executives currently employed by the Company who were named in the Summary Compensation Table of the Company's Proxy Statement for its 2008 Annual Meeting of Stockholders.

108.    On December 18, 2008, the parties submitted the Stipulation to the Delaware Chancery Court.  As a result of the settlement, in exchange for $0 cash and $0 non-cash benefit to Yahoo, the Delaware Chancery Court will release all claims relating to the Microsoft Offer, the Severance Plans and the Proxy battle and essentially provide the ultimate entrenchment of the Yahoo Board.

109.    The only result achieved is some minor changes to the Severance Plans as follows:

(i)    The "Change in Control" definition is amended to eliminate fundamental changes in the composition of the Board ("Fundamental Board Change") as a Change in Control event and

the Board's ability to deem a transaction to be a Change in Control event. Specifically, Sections 1.4 (b) and (e) of the Severance Plans are deleted.

(ii)     The "Potential Change in Control" definition is amended to eliminate the Board's ability to declare that a Potential Change in Control has occurred. Specifically, Section 1.18 (d) of the Severance Plans is deleted.

(iii)     The protection period following a Change in Control is amended to last for one year following a Change in Control instead of two years. Specifically, Section 1.5 of the Severance Plans is amended to state as follows: "Change in Control Protection Period" shall mean the period commencing on the date a Change in Control occurs and ending on the first anniversary of such date.

(iv)     The right of Yahoo employees to claim a right to receive severance benefits based on "Good Reason" pursuant to the Severance Plans is modified.  Specifically, Section 1.13 of the Severance Plans is amended to state as follows (in pertinent part): amend language of "Good Reason" definition to replace current language with the bolded language: "(a) a **material diminution** in the Eligible Employee's duties or responsibilities. . . (b) a **material reduction** in the Eligible Employee's annual base salary ...".

110.     In a January 27, 2009 press release, Yahoo announced its Fourth Quarter 2008 Financial Results and reported a decrease in revenues and fees from the same period in 2007 and an operating loss of $278 million.  Yahoo spent $ 7 million in the Fourth Quarter of 2008 and $79.4 million in 2008 alone on outside advisors related to Microsoft's proposals to acquire all or a part of the Company, the Google agreement, the proxy contest, and related litigation defense.  The reported results were as follows:

- Revenues were $1,806 million for the fourth quarter of 2008, a 1 percent decrease compared to $1,832 million for the same period of 2007.

- Fees revenues were $212 million for the fourth quarter of 2008, a 12 percent decrease compared to $242 million for the same period of 2007.

- Revenues excluding traffic acquisition costs ("TAC") were $1,375 million for the fourth quarter of 2008, a 2 percent decrease compared to $1,403 million for the same period of 2007.

- Operating loss for the fourth quarter of 2008 was $278 million compared to operating income of $191 million for the same period of 2007.

- Operating loss before depreciation, amortization, and stock-based compensation expense for the fourth quarter of 2008 was $60 million compared to operating income before depreciation, amortization, and stock-based compensation expense of $527 million for the same period of 2007.

- Free cash flow for the fourth quarter of 2008 was $219 million, a 34 percent decrease compared to $330 million for the same period of 2007.

- Net loss for the fourth quarter of 2008 was $303 million or $0.22 per diluted share compared to net income of $206 million or $0.15 per diluted share for the same period of 2007.

111.   According to January 2009 press release, Yahoo's full year 2008 operating income for 2008 was $13 million compared to $695 million for 2007 and net income for 2008 was $424 million or $0.29 per diluted share compared to $660 million or $0.47 per diluted share for 2007.

112.   If the Settlement is approved by the Delaware Chancery Court it will enter an Order and Final Judgment (the "Final Judgment"). The Final Judgment will dismiss with prejudice the settled claims asserted against Defendants in the Delaware Action. The "Settled Claims" includes all alleged breaches of fiduciary duty to Yahoo and its shareholders or other alleged violations of law, including the federal securities laws or other federal, state or local law, "arising from or in connection with Defendants' responses to Microsoft's proposal to acquire the Company, the Google Agreement or the proxy contest initiated by Carl Icahn."

113.   Plaintiffs' Counsel in the Delaware Action have or will apply to the Delaware Court for an award of Attorneys' Fees in an amount not to exceed $12,000,000 (the "Fee Application").

AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

114.   One Yahoo executive anonymously told *The New York Times*, "If the stock drops as far as I think it will, a lot of employees are going to be angry and many key employees could leave."  By June 30, 2008, Yahoo's price had fallen to $20.66, 37 % below Microsoft's offer of $33 per share.  As of December 18, 2008, when the settlement agreement was signed, Yahoo's shares were trading at $12.72, over 60% below Microsoft's Offer.

## THE DIRECTOR DEFENDANTS HAVE BREACHED THEIR FIDUCIARY DUTIES

115.   Defendants failed to properly consider and act with regard to the December 18, 2008 settlement, and instead chose to further entrench and benefit themselves by avoiding liability and depriving Yahoo and its shareholders of the opportunity to merge with one of the largest and wealthiest companies in the world during a time of financial stress and declining business values.

116.   Defendants' entrenchment actions including the settlement of shareholder claims will deprive the Company's public shareholders of enhanced settlement value that negotiation could provide.

117.   Defendants owe fundamental fiduciary obligations to Yahoo's stockholders to take all necessary and appropriate steps to recover the maximum amount for the losses incurred by the Company due to their misconduct.  In addition, the Individual Defendants have the responsibility to act independently so that the interests of Yahoo and its shareholders will be protected.  Further, the directors of Yahoo must adequately ensure that no conflict of interest exists between the Individual Defendants' own interests and their fiduciary obligations to maximize the values for Yahoo and its public shareholders, and if such conflicts exist, to ensure that all such conflicts will be resolved in the best interests of the Company's stockholders.

118.   Because Defendants dominate and control the business and corporate affairs of Yahoo and because they are in possession of private corporate information concerning Yahoo's assets, businesses and future prospects, there exists an imbalance and disparity of knowledge of economic power between Defendants and the public stockholders of Yahoo.  This discrepancy makes it grossly and inherently unfair for Defendants to entrench themselves at the expense of Yahoo and its shareholders.

119.   By the acts, transactions and courses of conduct alleged herein, Defendants,

- 35 -

individually and acting as part of a common plan, have violated their fiduciary duties by disenfranchising Yahoo's public shareholders, and by failing to adequately recover for the Yahoo Board's misconduct, without regard to the fairness of the settlement to Yahoo's shareholders.

120.    Defendants' settlement and further entrenchment was wrongful, unfair and harmful to Yahoo's public stockholders, and represents an attempt by Defendants to aggrandize their own personal and financial positions and interests of board members at the expense of, and to the detriment of, the stockholders and the Company.

121.    As demonstrated by the allegations above, Defendants have failed to exercise the care required and have breached their duties of loyalty, good faith, candor, and independence owed to Yahoo shareholders because:

•    they failed to act independently so that the interest of Yahoo shareholders will be protected;

•    they failed to properly and adequately consider taking other necessary steps to maximize shareholder value; and

•    they ignored or did not protect against the numerous conflicts of interest in connection with the settlement and its entrenchment effect.

122.    The Director Defendants have breached their fiduciary and other common law duties owed to Yahoo and its shareholders in that they have not, and are not, exercising independent business judgment and have acted, and are acting, to the detriment of the Class and for their own personal benefits.  The Director Defendants have violated their fiduciary duties of care, loyalty, candor, good faith and independence owed to the public shareholders of Yahoo and have acted to put their personal interests ahead of the interests of Yahoo and its shareholders.

123.    By reason of the foregoing acts, practices and course of conduct, the Defendants have failed to exercise ordinary care and diligence in the exercise of their fiduciary obligations. Defendants have also engaged in self dealing and have not acted in good faith.  The Director Defendants have unlawfully entrenched themselves in their positions of control, and have not been compelled to carry out their fiduciary duties to maximize shareholder value.

AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

124.   As a result of Defendants' actions, the Company has been and continues to be harmed.

125.   Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury which Defendants' actions threaten to inflict.

126.   Unless enjoined by the Court, Defendants will continue to breach their fiduciary duties owed to Yahoo stockholders, and/or aid and abet and participate in such breaches of duty, and will prevent the sale of Yahoo.

127.   Yahoo shareholders have no adequate remedy at law.

128.   The unfairness of the Director Defendants' conduct is compounded by the disparity between the knowledge and information possessed by the Director Defendants by virtue of their positions of control of Yahoo and that possessed by Yahoo's public shareholders.

129.   Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress the Director Defendants' breaches of fiduciary duties, statutory violations and/or other violations.

130.   Plaintiff is the owner of Yahoo common stock and is the owner of Yahoo common stock at all relevant times.

131.   Plaintiff will adequately and fairly represent the interests of Yahoo and its shareholders in enforcing and prosecuting its rights.

**DERIVATIVE ACTION AND DEMAND ALLEGATIONS**

132.   As a result of the facts set forth herein, Plaintiff has not made any demand on the Yahoo Board to institute this action against the Director Defendants.  Such demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.  The extraordinary and aggressive actions already taken to escape liability for the Yahoo Board's misconduct in misleading shareholders makes it clear that the Board is incapable of making a disinterested decision.

133.   At the time this action was commenced, the Board consisted of eleven directors.  A majority of the directors (8 of the 11 directors) knowingly and deliberately participated in the misconduct alleged herein and were individually incapable of independently and disinterestedly

1    considering a demand to commence and vigorously prosecute this action.

2        134.    The Director Defendants, which are the eight disinterested directors, are incapable

3    of independently considering a demand to commence and vigorously prosecute this action for the

4    following reasons:

5        a.    Each of the Director Defendants knowingly and deliberately participated in

6    and approved the course of conduct alleged herein and will benefit from this entrenchment plan,

7    and therefore, is substantially likely to be held liable for the misconduct complained of.

8        b.    In connection with the June 9, 2008 proxy statement, each of the Director

9    Defendants knowingly and intentionally misrepresented Yahoo's compensation practices.

10       c.    Defendants Bostock, Burkle and Kern were on the Compensation

11   Committee that set Yahoo's compensation practices.   As members of the Compensation

12   Committee, Defendants Bostock, Burkle and Kern were responsible for approving any

13   compensation plans and working with the Board's Independent Consultants to prepare any plan.

14   Defendants Bostock, Burkle and Kern knowingly and deliberately ignored their fiduciary duties to

15   the shareholders in approving the compensation plans, failed to advise and/or rely on the judgment

16   of their Independent Consultants, and participated in the preparation and approved the disclosure

17   of same in the 2008 proxy statement.   In connection with the 2008 proxy statement, Defendants

18   Bostock, Burkle and Kern knowingly and intentionally misrepresented the impact and cost of

19   compensation plans while simultaneously requesting shareholder approval of their own re-election

20   and a no vote on a shareholder proposal for compensation linked to performance.

21       135.    The course of conduct alleged herein has resulted in a loss of $110 million in cash

22   and $22 billion loss in market value for Yahoo, none of which is being reimbursed by this

23   settlement.

24                              **COUNT I**
     **Against Defendants Jerry Yang, Ron Burkle, Robert Kotick, Gary Wilson,**
25   **Maggie Wilderotter, Roy Bostock, Eric Hippeau, Arthur R. Kern, Edward Kozel**
     **and Vyomesh Joshi for Violations of §14(a) of the Securities Exchange Act of 1934**
26

27       136.    Plaintiffs incorporate by reference and reallege each and every allegation set forth

28   above, as though fully set forth herein.

AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

137.    Rule 14-A-9, promulgated pursuant to § 14(a) of the Securities and Exchange Act of 1934, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."  17 C.F.R. §240.14-A-9.

138.    The June 9, 2008 proxy statements described herein violated §14(a) of the Securities and Exchange Act of 1934 and Rule 14-A-9, C.F.R. §240.14-A-9, because the Director Defendants made false and misleading statements and omitted material facts, and were contrary to the "pay for performance" shareholder proposal and the Yahoo Board's responses to the proposal.

139.    Defendants Yang, Burkle, Kotick, Wilson, Wilderotter, Bostock, Hippeau, Kern, Kozel and Joshi knew that the proxy statements were materially false and misleading.

140.    The misrepresentations and omissions in the proxy statements were material.  The proxy statements were an essential link in the accomplishment of the continuation of their entrenchment scheme, as revelations of the truth would have immediately thwarted a continuation of the shareholders' endorsement of the directors' positions, the executive officers' compensation and the Company's compensation policies.

141.    The Company was damaged as a result of the material misrepresentations and omissions in the June 9, 2008 Proxy Statement.

## COUNT II
### Against All Defendants for Violation of §20(a)
### of the Securities Exchange Act of 1934

142.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

143.    The Director Defendants by virtue of their positions with Yahoo and their specific acts were, at the time of the wrongs alleged here, controlling persons of Yahoo within the meaning of §20(a) of the Exchange Act.  They had the power and influence and exercised same to cause Yahoo to engage in the illegal conduct and practices complained of herein.

- 39 -

## COUNT III
### Breach of Fiduciary Duty

144.    Plaintiff repeats and realleges all previous allegations as if set forth in full herein.

145.    By reason of the foregoing, the Defendants have breached their fiduciary duties to Yahoo and its shareholders under Delaware law or aided and abetted in the breach of those fiduciary duties.  Specifically, Defendants have breached their duty of care by further entrenching themselves through the December 18, 2008 Settlement.

## COUNT IV
### Corporate Waste

146.    Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

147.    As to result of the conduct described above, the Director Defendants will be and have been unjustly enriched at the expense of Yahoo, in the form of unjustified salaries, benefits, bonuses, and other emoluments of office.

148.    All the payments and benefits provided to the Director Defendants were at the expense of Yahoo.  The Company received no benefit from these payments, and Yahoo was damaged by such payments.

**WHEREFORE**, Plaintiff demands judgment as follows:

a.    Awarding compensatory damages against Defendants, jointly and severally, in an amount to be determined at trial, together with pre-judgment and post-judgment interest at the maximum rate allowable by law;

b.    Requiring the Director Defendants to conduct a fair process to evaluate the Company's value;

c.    Directing that Defendants to account for all damages caused to the Company and account for all profits and any special benefits obtained by Defendants as a result of their unlawful conduct;

d.    Awarding the Plaintiff pre- and post-judgment interest at the statutory rate;

e.    Awarding Plaintiff its costs and disbursements, including reasonable allowances for fees of Plaintiff's counsel and reimbursement of expenses; and

- 40 -

1      Granting Plaintiff such other and further relief as the Court may deem just and proper.

2  **JURY TRIAL DEMANDED**

3      Plaintiff demands a trial by jury.

4

5  **CERTIFICATION OF INTERESTED ENTITIES OR PERSONS**

6      Pursuant to Civil L.R. 3-16, the undersigned certifies that as of this date, other than the

7  named parties, there is no such interest to report.

8  DATED:  February 20, 2009            WOLF HALDENSTEIN ADLER

9                                       FREEMAN & HERZ LLP

10                               FRANCIS M. GREGOREK
                                 BETSY C. MANIFOLD
                                 RACHELE R. RICKERT

11

12

13                               BETSY C. MANIFOLD

14                               750 B Street, Suite 2770
                                 San Diego, CA 92101

15                               Telephone:  619/239-4599
                                 Facsimile:  619/234-4599

16                               LAW OFFICE OF JACOB T. FOGEL, PC

17                               JACOB T. FOGEL
                                 32 Court Street, Suite # 602

18                               Brooklyn, New York  11201
                                 Telephone:  718/221-5552

19                               Facsimile:  718/228-0278

20                               Attorneys for Plaintiff

21

22

23

24

25 YAHOO:16564

26

27

28

- 41 -

## <u>VERIFICATION</u>

I, Yonason Katz, on behalf of Congregation Beth Aaron, declare that I am a shareholder of Yahoo common stock and have continuously so owned Yahoo common stock at all relevant times described in the complaint.

I have reviewed the foregoing Amended Verified Shareholder Derivative Complaint, and authorized its filing.   Based upon the investigation of my counsel, the allegations in the Complaint are true to the best of my knowledge, information and belief.

This Verification is made subject to the penalties of perjury under the laws of the United States.

Dated: February 19, 2009

_____
Yonason Katz on behalf of
Congregation Beth Aaron

YAHOO:16604

## DECLARATION OF SERVICE

I, Marta Stasik, the undersigned, declare:

1.     That declarant is and was, at all times herein mentioned, a citizen of the United States and a resident of the County of San Diego, over the age of 18 years, and not a party to or interested in the within action; that declarant's business address is 750 B Street, Suite 2770, San Diego, California 92101.

2.     That on February 20, 2009, declarant served:

**AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

via electronic and U.S. mail to parties listed on the service list.

3.     That there is regular communication between the parties.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 20th day of February 2009, at San Diego, California.

_____
MARTA STASIK

- 42 -

IN RE YAHOO! INC. SHAREHOLDER LITIGATION
Service List – March 6, 2008
Page 1

COUNSEL FOR PLAINTIFFS

Francis M. Gregorek
Betsy C. Manifold
Rachele R. Rickert
Marisa C. Livesay
WOLF HALDENSTEIN ADLER
  FREEMAN & HERZ LLP
750 B Street, Suite 2770
San Diego, CA 92101
        619/239-4599
        619/234-4599 (fax)
gregorek@whafh.com
manifold@whafh.com
rickert@whafh.com
livesay@whafh.com


    Jacob T. Fogel
 *  LAW OFFICE OF JACOB T. FOGEL, PC
    32 Court Street, Suite 602
    Brooklyn, NY 11201
        718/855-4792
        718/228-0278 (fax)


COUNSEL FOR DEFENDANTS

    Garret J. Waltzer
 ** SKADDEN ARPS SLATE
      MEAGHER & FLOM LLP
    525 University Avenue, Suite 1100
    Palo Alto, CA 94301
        650/470-4500
        650/470-4570 (fax)
    gwaltzer@skadden.com

    **Counsel for Defendant Yahoo! Inc.**

    John W. Spiegel
    Robert L. Dell Angelo
 *** MUNGER, TOLLES & OLSON, LLP
    355 South Grand Avenue, 35th Floor
    Los Angeles, CA 90071
        213/683-9100
        213/687-3702 (fax)
    John.Spiegel@mto.com
    Robert.DellAngelo@mto.com

    **Counsel for Defendants Roy
    Bostock, Ron Burkle, Eric Hippeau,
    Vyomesh Joshi, Arthur Kern,**

**Robert Kotick, Edward Kozel,
Terry S. Semel, Maggie Wilderotter,
Gary Wilson and Jerry Yang**


 *      U.S. Mail
 **     CM/ECF
 ***    Electronic mail